UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHALONDA HARRIS                          CIVIL ACTION
for J.H.

VERSUS                                   NUMBER: 10-01745

MICHAEL J. ASTRUE,                       SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 13, 15).

On February 8, 2007, Shalonda Harris, mother of the plaintiff-in-interest herein, J.H., filed an application for SSI benefits on behalf of the minor child alleging disability as of February 6, 2007. (Tr. pp. 123-125).  In an undated Disability Report that was presumably completed around the same time as the application the

conditions resulting in plaintiff's disability were identified as Attention Deficit Disorder ("ADD") and Attention Deficit Hyperactivity Disorder ("ADHD"). (Tr. pp. 133-139). Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on May 16, 2007. (Tr. pp. 58-61). Pursuant to his request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on March 31, 2009 at which plaintiff, who was represented by counsel, and plaintiff's mother appeared and testified. (Tr. pp. 62-63, 26-56). On August 4, 2009, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 10-24). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. p. 1-3). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.   [t]he ALJ's finding that plaintiff was an adolescent as of the date his application was filed is incorrect.

II.  [s]ubstantial evidence does not support the ALJ's finding that plaintiff has only a less than marked impairment in the domain of "caring for yourself."

(Rec. doc. 13-1, p. 7).

Relevant to the resolution of those issues are the following findings that were made by the ALJ:

1. [t]he claimant was born on October 3, 1996. Therefore, he was an adolescent on February 8, 2007, the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2. [t]he claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 416.972).

3. [t]he claimant has the following severe impairments: Disruptive Behavior Disorder and Attention Deficit Hyperactivity Disorder (20 CFR 416.924(c)). These are severe impairments within the meaning of Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and the Regulations.

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. [t]he claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6. [t]he claimant has not been disabled, as defined in the Social Security Act, since February 8, 2007, the date the application was filed (20 CFR 416.924(a)).

(Tr. pp. 16, 23).

Judicial review of the Commissioner's decision to deny SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992);

3

<u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner.  <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant, whether a child or an adult, bears the burden of proving that he is disabled within the meaning of the Social Security Act.  <u>Fraga</u>, 810 F.2d at 1301.  In making a disability determination on a child, the Commissioner utilizes the three-step sequential analysis set forth in 20 C.F.R. §416.924, as follows:

1.   determine whether the child engaged in substantial

4

> gainful activity during the relevant time frame and, if not;
>
> 2. determine whether the child has a medically determinable severe impairment and, if so;
>
> 3. determine whether the impairment meets, medically equals, or is functionally equal to an impairment set forth in the Listing of Impairments, Appendix l, Subpart P, Part 404.
>
> See <u>Verrett v. Commissioner of Social Security</u>, 2001 WL 179922 at *1 n.7 (E.D. La. Feb. 20, 2001).

In determining whether a child's impairment is functionally equivalent to one of those set forth in the Listing of Impairments, the Commissioner considers the child's limitations in the following six domains: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and, health and physical well-being. 20 C.F.R. §416.926a(b)(1). To be functionally equal to a listing and thus of listing-level severity, the child must have "marked" limitations in two of the six domains or an "extreme" limitation in one domain. 20 C.F.R. §416.926a(a). In evaluating a child's ability to function in each domain, the Commissioner is to consider: 1) the activities the child is able to perform; 2) the activities the child is not able to perform; 3) which of the child's activities are limited or restricted compared to children of the same age who do not have impairments; 4) whether

5

the child has difficulty with activities at home, in childcare, at school, or in the community; 5) whether the child has difficulty independently initiating, sustaining, or completing activities; and, 6) what kind of help the child needs to do activities, how much, and how often.   20 C.F.R. §416.926a(b)(2); <u>Mapps v. Astrue</u>, 2010 WL 1946662 at *8 (N.D. Tex. Apr. 30, 2010), <u>adopted</u>, 2010 WL 1948363 (N.D. Tex. May 13, 2010).

At the time of the administrative hearing that was held on March 31, 2009, plaintiff was twelve years of age, was in regular education classes in the sixth grade, and lived in a house with his mother, step-father, and three siblings.  Based upon a review of the ALJ's introductory remarks, it appears that this was not the first time that an attempt had been made to hold a hearing, with plaintiff possibly holding his hands over his eyes on a previous occasion.[1] After the documentary exhibits were formally admitted into evidence plaintiff was questioned by the ALJ.  He testified that he was doing "all right" in school but his most recent report had been somewhat disappointing with poor, albeit passing, grades being earned in science and social studies although he had scored A's, B's, and C's in other subjects.  Plaintiff was able to use a

---

[1] Indeed, the administrative record contains three notices scheduling the hearing for September 24, 2008, November 14, 2008, and January 6, 2009. (Tr. pp. 74-80, 81-92, 98-109).

computer to conduct research, play games, listen to music, and to browse social networking sites.  He had developed a great interest in music and, when prompted by the ALJ, plaintiff even demonstrated a sampling of his "rap" music singing talents.  When asked how he came to be involved in the SSI benefit application process, plaintiff testified that he sometimes heard voices and strange noises.  He generally got along with his siblings but tended to spend a lot of time in his room watching TV or movies.  Plaintiff was on prescribed medication that he was unable to identify and he enjoyed eating a variety of fresh fruit and fish. (Tr. pp. 28-41).

Upon being questioned by his attorney, plaintiff testified that he was not an "outside person" and that he had friends who lived in the neighborhood but that he did not see them very often. He did not have many friends at school and although he tried to be cordial with his classmates the other children had a tendency to pick on him and to instigate fights with him.  When asked whether he had difficulty controlling himself plaintiff stated that he "... g[o]t talked to", presumably by school officials, or when he became excited.  When he got angry he tried to calm himself down to avoid being suspended.  In answer to his attorney's question, plaintiff testified that he did not have difficulty paying attention although he did get distracted and tended to laugh and giggle a good deal. He was able to sit still unless he had to use the restroom.  When

7

asked whether he had recently had an "accident", plaintiff gave a rather lengthy rambling explanation in which he indicated that he had mistakenly gotten urine on one of his pants legs while hurrying to use the restroom and that water from an improperly closed bottle in his backpack had spilled onto his shirt, causing other students and teachers to believe that he had soiled himself. (Tr. pp. 41-46).

Plaintiff's mother then took the stand and was initially questioned by the ALJ about using her own mother's address as her mailing address.   When she explained that she had changed residences a number of times, the ALJ questioned what effect such frequent moves would have on her children's education. (Tr. pp. 46-48).  Upon being tendered to counsel for additional questioning the mother testified that plaintiff's problems with bed-wetting had recently worsened to almost nightly occurrences after initially subsiding with the use of prescribed medication.   Contrary to plaintiff's earlier account, his mother testified that he had indeed soiled himself at school the day before the hearing as well as on two other occasions.  Over the previous year, plaintiff had obtained treatment from separate doctors for his enuresis and ADD as well as counseling from a third healthcare provider.   The effectiveness of the treatment had diminished over time and plaintiff's doctors were constantly changing the types and dosages

of his medications.

Continuing, plaintiff's mother testified that her son's grades in school had recently declined even though she felt that he was a bright child.  She stated that plaintiff had gotten into an altercation with the sole neighborhood friend that he did have and did not want to be bothered with his own siblings notwithstanding the age and gender differences among them.  Plaintiff's mother described him as a "... very, very, very compulsive" person who was known to lie for no reason with the recent water bottle incident at the school being cited as an example.  When asked why she believed plaintiff should be awarded Social Security benefits, the mother testified that plaintiff was not "stable" and had been a difficult child since kindergarten. She further testified that plaintiff had difficulty staying in school and that his placement in a "boot camp" program had been contemplated the previous year as a result of his arguments with classmates and teachers and fighting with other children.  What had started off as a promising school year had soured and plaintiff's mother was unsure whether it was attributable to medication effectiveness or some other cause. (Tr. pp. 48-56).

The documentary evidence that was admitted in the administrative proceedings below begins with an operative report from the North Oaks Pediatric KidMed Clinic ("NOPKMC") dated

9

October 20, 2004 where plaintiff underwent a meatotomy to address issues of urinary frequency and nocturnal enuresis. (Tr. p. 244). Plaintiff would subsequently be seen at NOPKMC on January 24, 2007 where his mother reported that he was experiencing behavior problems at school. (Tr. p. 196). An ADHD evaluation went forward the following day at which it was noted that plaintiff's behavior problems had begun in kindergarten, that he was out of school for the year, and that he could not be still, talked back to others, and was inattentive. (Tr. p. 196). Plaintiff was seen again at NOPKMC on February 6, 2007 and Adderall was prescribed. (Tr. p. 195).

On February 8, 2007, plaintiff's mother completed the Administration's from denominated "Function Report-Child" that elicited information about her son's abilities. There, plaintiff's mother checked off the appropriate boxes on the form to indicate that the child's ability to communicate was limited in that he was unable to explain why he had done something or to talk with family members. Plaintiff was also unable to make correct change, had no friends his own age, could not make new friends, and was generally unable to get along with teachers. Plaintiff's ability to pay attention and to stick with a task were also limited in all five of the enumerated activities. (Tr. pp. 143-155). Plaintiff returned to NOPKMC on February 21, 2007 at which time his mother reported

10

that the prescribed medications were not helping.  The medication dosages were thus adjusted. (Tr. p. 195).

On February 27, 2007, plaintiff's teacher at the Hammond Westside Upper School completed the Administration's "Teacher Questionnaire" and provided her opinions on his functioning at school.  Plaintiff was in the fourth grade at the time where he was reading and performing math at that grade level but was in the third grade level for written language.  Although the teacher observed no problems in acquiring and using information, she did feel that without medication, plaintiff had deficits in attending to and completing tasks, with some of those deficits being a very serious problem and occurring almost hourly.  In the domain of interacting with and relating to others, the teacher felt that plaintiff had serious, hourly problems in five of the thirteen enumerated activities resulting, over time, in the implementation of a behavior plan, removal from class, in-school and out-of-school suspensions, and expulsion, with plaintiff being described as extremely disrespectful.  Without medication plaintiff was also thought to have problems in moving about and manipulating objects but those were less severe than the other domains.  In the area of caring for himself, plaintiff was said to have very serious, hourly problems in handling frustration appropriately and being patient when necessary as well as problems of lesser severity in various

other activities. The teacher indicated that plaintiff's functioning improved after he took his medication but she was unsure if he did so on a regular basis. (Tr. pp. 156-167).

Plaintiff was next seen at NOPKMC on March 6, 2007 to obtain a refill on his Adderall. The treatment note from that day contains a notation that plaintiff had been suspended from school. (Tr. p. 216). On March 12, 2007, an Administration examiner reviewed plaintiff's file and formally requested medical advice from a specialist in the field of mental disorders as to whether a consultative evaluation was needed in adjudicating plaintiff's application for SSI benefits. (Tr. p. 175). Plaintiff's file was reviewed a second time by an Administration psychologist who directed that a mental status examination be ordered. (Tr. p. 176). Plaintiff failed to keep an appointment at NOPKMC on March 27, 2007 but he was seen there on April 20, 2007 to obtain an Adderall refill. Focalin was added to his medication regimen in the hope of controlling his ADHD. (Tr. p. 216).

On April 30, 2007, plaintiff, who was then ten years of age, underwent a consultative psychological evaluation by Dr. Sandra Durdin. Plaintiff was appropriately groomed and dressed but began the interview by reciting facts in "baby talk". When the importance of his cooperation was explained to him, plaintiff became more focused. In providing plaintiff's history, his mother

reported that his speech was not always clear but the doctor observed no communicative deficits. Plaintiff was in fourth grade regular education classes at the time where he had obtained an "F" in math and "B's" in all of his other subjects and he had never been held back in school. He had just finished some type of anger management program and was reported to misbehave more at school as well as to lie, steal, and fight, resulting in repeated suspensions. Plaintiff tended to speak out of turn and to leave his desk in class and school records also showed that he had refused to get out of his seat for a fire drill. He had also brought an iPod to school on one occasion.

Plaintiff's pediatrician at the time of the evaluation was Dr. Donner. Plaintiff's mother reported an unspecified history of bed-wetting which had stopped recently and which apparently ran in the family. He played but tended to start fights and although it required his mother's prompting, he could take care of his personal needs. Recreation included playing video games, watching TV, such as wrestling matches, MTV, BET, and National Geographic, and playing football, soccer, basketball, baseball, bowling, and skating. Plaintiff had run away from home a few weeks earlier and was ultimately found at a neighbor's house playing. As punishment, plaintiff's mother had whipped the child and had the police talk to him. Plaintiff himself reported that he had taken his cousin's

13

medication on one occasion.  He spoke with his father daily and visited with him and his aunt on occasion, although the mother stated that plaintiff's father was "not in the picture".  Plaintiff told the doctor that he played with neighborhood friends and he spoke of a friend who wanted to be a wrestler with him.

Dr. Durdin found plaintiff's speech and language to be fully intelligible and his vocabulary to be good.  No sensory or motor deficits were observed and plaintiff was calm and functioned at a normal pace.  Attention, concentration, and the ability to follow directions were good and plaintiff was persistent and oriented. Abstract reasoning was good, thought organization was logical, and plaintiff caused no problems throughout the evaluation.  He did not exhibit any ADHD symptoms while in the waiting room or in session and was reportedly in medication compliance.  However, he did appear to have a significant behavior disorder tied to family problems including exposure to domestic fighting.  In terms of style, interests, and activities, plaintiff presented as if already in adolescence.  The diagnosis in the Axis I domain was disruptive behavior disorder, not otherwise specified, with diagnoses in Axis II and III being deferred.  In summarizing the results of her evaluation, Dr. Durdin remarked that plaintiff's ability to acquire and use information was good and his ability to attend to and complete tasks could be good.  Plaintiff appeared to be capable of

14

cooperating when he wanted to but his ability to interact and to relate with others was variable.  The ability to move about and to manipulate objects was good, his ability to care for himself was adequate, and his health and physical well-being were reportedly good. (Tr. pp. 198-202).

Plaintiff returned to NOPKMC on May 4, 2007 to obtain a refill on his Focalin.  His teacher reported that he was doing better but the treatment note from that date is not entirely legible. (Tr. p. 215).  On May 14, 2007, an Administration examiner reviewed plaintiff's file and requested medical advice from a specialist in the field of mental disorders as to whether plaintiff suffered from a severe impairment in light of the consultative report from Dr. Durdin. (Tr. p. 173).  That was accomplished on May 15, 2007 with the psychologist concluding that plaintiffs condition did not meet or equal the criteria of a mental listing set forth in the Listing of Impairments. (Tr. p. 174).  In connection with the Administration's consideration of plaintiff's application at the initial level, the psychologist also completed a "Childhood Disability Evaluation Form" identifying plaintiff's impairment as a disruptive behavior disorder which failed to meet, equal, or functionally equal a listing.  In the "Functional Equivalence" portion of the form the psychologist found that plaintiff suffered from a marked limitation in interacting and relating with others,

a less than marked limitation in three other domains, including caring for himself, and no limitations in the remaining two domains.  In the explanation portion of the form, it was noted that plaintiff had been suspended from school over twenty times between October of 2006 and January of 2007.  Plaintiff's allegations regarding mental limitations were deemed to be fully credible but listing-level severity was not thought to be established. (Tr. pp. 203-208).

Plaintiff was next seen at NOPKMC on September 27, 2007 at which time his mother complained that he had been wetting his bed in the evening, prompting her to curtail his access to any liquids after 9:00 p.m.  It was also noted that plaintiff was disruptive in class.  The dosage of plaintiff's medication was adjusted. (Tr. pp. 215, 212).  An ADHD check-up at NOPKMC went forward on October 23, 2007 and urinary frequency was reported.  Plaintiff was referred to another doctor and the dosage of his medication was adjusted further. (Tr. p. 217).  By November 14, 2007, it was noted that plaintiff was doing better, having made the honor roll at school. Medications were prescribed and another referral was made. (Tr. p. 217).  Plaintiff received routine immunizations on May 28, 2008. (Tr. p. 214).

On June 2, 2008, plaintiff's mother accompanied him to NOPKMC for a Focalin refill, reporting that he had been "put out of

16

school" from January to March 30th but that he had "passed" nonetheless.   A psychiatry referral was made. (Tr. p. 213). Plaintiff was seen at the Multipractice Clinic in Independence, La. on October 8, 2008 for evaluation and treatment of ADHD.  His mood and affect were characterized as stable and his hyperactivity was improved but he continued to talk in class.  Vyvanse was prescribed and plaintiff was to return to the clinic in one month. (Tr. p. 273).  An appointment at NOPKMC scheduled for October 9, 2008 was not kept. (Tr. P. 218).   By November 6, 2008, plaintiff's concentration and attention had improved, his mood and affect were within normal limits, there were no identified behavioral problems, and his sleep and appetite were said to be "OK".   Plaintiff was continued on the same course of medication therapy. (Tr. pp. 272, 281).

Plaintiff returned to the Multipractice Clinic on December 8, 2008 for a medication refill.  A mental status examination that was performed on that date was normal. (Tr. pp. 271, 280).   The referral to the Multipractice Clinic was noted in NOPKMC records on December 9, 2008. (Tr. p. 249). A refill on plaintiff's medication was approved by NOPKMC on December 29, 2008 as he was apparently still having difficulties with enuresis. (Tr. p. 248).   At plaintiff's next visit to the Multipractice Clinic on January 12, 2009, it was noted that his grades were dropping, that his

17

cognition was down to fair, and that he felt sleepy in class. The dosage of Vyvanse was increased. (Tr. pp. 270, 279). The next treatment note from the Multipractice Clinic dated March 11, 2009 indicates that plaintiff had not yet exhausted his supply of medication despite having been seen there more than thirty days earlier. Plaintiff had also been suspended for fighting. The dosage of Vyvanse was increased yet again and Periactin added to plaintiff's regimen. (Tr. p. 269, 278).

At his next visit to the Multipractice Clinic on April 18, 2009, the nurse practitioner observed that plaintiff had been involved in another fight at school. (Tr. p. 268). Refills on his medications were authorized. (Tr. p. 277). However, by May 14, 2009, there were no further significant behavioral problems. (Tr. p. 267). Plaintiff's medications were again refilled. (Tr. p. 276). Plaintiff subsequently met with a social worker from the Multipractice Clinic on June 4, 2009 who noted that although he reported doing well overall, his grades were down and he had a tendency to shift blame from himself and to focus on others. (Tr. p. 282). When next seen by the clinic nurse practitioner on June 15, 2009, plaintiff's behavior was characterized as appropriate and he had no significant health problems. Plaintiff was continued on his medications. (Tr. p. 266). He was next seen by the Multipractice Clinic social worker on July 1, 2009 where

18

plaintiff's mother indicated that plaintiff was doing well with no significant behavioral problems.   Supportive therapy was to be continued along with plaintiff's prescribed medications. (Tr. pp. 283, 275).   Finally, plaintiff returned to the clinic's nurse practitioner on July 14, 2009 and again no behavior problems were reported.  A refill of Vyvanse was authorized and plaintiff was to return for re-evaluation in six weeks. (Tr. p. 265).

Plaintiff's first challenge to the Commissioner's decision is that the ALJ erroneously found that he was an adolescent as of the date that the application for SSI benefits was filed. Defendant acknowledges that an error was indeed made in that regard but argues that any such error was harmless. (Rec. doc. 152-2, p. 4). As will be discussed <u>infra</u>, because the Court believes that plaintiff's second challenge to the Commissioner's decision has merit, resolution of his first challenge is unnecessary.[2]

In his second challenge to the Commissioner's decision, plaintiff argues that substantial evidence does not support the ALJ's determination that plaintiff has only a less than marked impairment in the domain of "caring for yourself."

---

[2]  The Court parenthetically notes that in <u>Jefferson v. Barnhart</u>, 356 F.Supp.2d 663, 673 n. 10 (S.D. Tex. 2004), the court found it necessary to review the listings relating to both primary school children and to adolescents because the plaintiff was eleven years old when the application for benefits was filed but was thirteen years old at the time of the administrative hearing.

As noted earlier, functional equivalence is determined by assessing the degree of a child's limitations in six domains with listing-level severity being established if the child has "marked" limitations in two of the six domains or if he has an "extreme" limitation in one domain. 20 C.F.R. §416.926a(a). A marked limitation exists when an impairment or combination of impairments interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(2)(i). A child's day-to-day functioning may be seriously limited when his impairments limit only one activity or when the interactive cumulative effects of his impairments limit several activities. Id. A marked limitation is one that is more than moderate but less than extreme. Id. No one piece of information can be viewed in isolation in determining whether a particular limitation is marked. 20 C.F.R. §416.926a(e)(4).

In the domain of caring for yourself, the Commissioner considers "... how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions and living area." 20 C.F.R. §416.926a(k). The relevant portions of the Commissioner's functional equivalence Regulation provide the following guidance in

the domain of caring for yourself:

(1) *General.* (i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.
(ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.
(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.
(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

20 C.F.R. §416.926a(k)(1).

The Regulations then set forth the following age group descriptors for evaluating functional equivalence in the "caring for yourself" domain as well as some examples of limited functioning in that area:

21

(iv) *School-age children (age 6 to attainment of age 12)*.  You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely.  You should begin to recognize that you are competent in doing some activities and that you have difficulty with others.   You should be able to identify those circumstances when you feel good about yourself and when you feel bad.  You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior.  You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you.  You should begin to imitate more of the behavior of adults you know.

(v)   *Adolescents (age 12 to attainment of age 18)*. You should feel more independent from others and should be increasingly independent in all of your day-to-day activities.  You may sometimes experience confusion in the way you feel about yourself.  You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body.  Sometimes these worries can make you feel angry or frustrated.  You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down).  You should begin to think seriously about your future plans, and what you will do when you finish school.

(3) *Examples of limited functioning in caring for yourself*. The following examples describe some limitations we may consider in this domain.  Your limitations may be different from the ones listed here.  Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one.  As in any case, your limitations must result from your medically determinable impairment(s).  However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i)  You continue to place non-nutritive or inedible objects in your mouth.

(ii)  You  often  use  self-soothing  activities  showing

22

developmental regression (e.g., thumb sucking, re-chewing of food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
(iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
(iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.
(v)   You do not spontaneously pursue enjoyable activities or interests.
(vi) You have disturbance in eating or sleeping patterns.

> 20 C.F.R. §416.926a(k)(2)(iii) and (iv).

Providing further guidance in evaluating functional equivalence is Social Security Ruling 09-7p, 2009 WL 396029, which emphasizes that the domain of "caring for yourself" does not address children's physical abilities to perform self-care tasks but instead focuses on how well a child relates to himself by maintaining a healthy emotional and physical state in ways that are age-appropriate in comparison to other same-age children who do not have impairments.  "In addition to regulating emotional well-being," .... SSR 09-7p instructs, "... a child must be able to satisfy physical wants and needs every day", requiring "... children to have a basic understanding of their own bodies, including their bodies' normal functioning, and adequate emotional health for carrying out the tasks involved in self-care."  The domain of "caring for yourself" thus centers on "... the emotional ability to engage in self-care activities, such as feeding,

23

dressing, toileting, and maintaining hygiene and physical health"
as well as following safety rules, responding to circumstances in
safe and appropriate ways, and making decisions that do not
endanger oneself.  SSR 09-7p, 2009 WL 396029 at *3-4.

In the present case, the ALJ made the following findings in
the domain of "caring for yourself":

> [t]he claimant's mother admits that the claimant is
> capable of taking care of his personal needs during the
> consultative examination (with prompting) and on the
> Function report (without prompting).
>
> [h]is teacher reported that he has problems with handling
> frustration appropriately and with being patient when
> necessary.  Thus, the undersigned concludes that the
> claimant has [a] less than marked limitation in the
> ability to care for himself.

(Tr. p. 22).

In the Function Report that she completed on February 8, 2007,
plaintiff's mother provided a negative answer to the question of
whether plaintiff's impairment affected his ability to help himself
and to cooperate with others in taking care of personal needs. (Tr.
p. 151).  And when plaintiff was evaluated by Dr. Durdin on April
30, 2007, it was reported that "[t]he mother prompts him but he can
take care of his (sic) self." (Tr. p. 199).  The ALJ was thus
correct in those respects.  The ALJ was also correct in noting that
plaintiff's teacher had indicated on February 27, 2007 that the
child had problems with handing frustration appropriately and with

24

being patient when necessary. (Tr. pp. 161, 256).  What was not discussed, however, was the teacher's additional report that the two deficits that she had identified were "very serious problem[s]", at a level "5" on a scale of 1 to 5, which occurred on an hourly basis. (Id.).  The teacher had also indicated that plaintiff had serious, daily problems in using good judgment regarding personal safety and in dangerous circumstances and in knowing when to ask for help. (Id.).  Obvious, daily problems were also present in taking care of personal hygiene, cooperating in/being responsible for taking needed medications, identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and in using appropriate coping skills to meet the daily demands of the school environment. (Id.).

Also casting doubt on the correctness of the ALJ's decision in the domain of caring for yourself is the rather extensive evidence of plaintiff's significant behavioral problems at school.  Those difficulties, going back to kindergarten, were first reported to NOPKMC personnel on January 24 and 25, 2007 when it was thought that plaintiff might be forced out of school for the remainder of that school year.  Plaintiff's mother would subsequently indicate in the Function Report that plaintiff had no friends his own age, did not make new friends, and was unable to get along with his teachers.  The Teacher Questionnaire that appears in the record

reflects that between September 28, 2006 and February 27, 2007, plaintiff received approximately twenty-one in-school suspensions and four days of out-of-school suspensions with expulsion proceedings being initiated following the last incident. (Tr. pp. 164-166, 259-261).   Among the disciplinary episodes that were described in any detail were fighting and pushing in the bathroom accompanied by disrespect to authority and continuous conflict; refusing to get out of his desk for a fire drill, doing so only after being asked four times and under the threat of the principal being summoned, then walking as slowly as possible out of the building; while the teacher was teaching, getting out of his seat and hitting another student in the back of the head; continuously yelling out during reading and talking back to the teacher when corrected or reminded of the rules; and, threatening other students and accusing the teacher of lying to his mother. (Tr. pp. 165-166, 260-261).

By the time that plaintiff was seen again at NOPKMC on March 6, 2007, he had apparently been suspended yet again.  In rendering her diagnosis of disruptive behavior disorder, Dr. Durdin noted that plaintiff had recently attended anger management counseling to address his chronic misbehavior at school that was manifested by lying, stealing, and fighting and resulted in repeated suspensions. Plaintiff had also recently run away from home and on one occasion

26

had taken medication prescribed to his cousin.  On June 2, 2008, NOPKMC personnel noted that plaintiff had been put out of school again so a psychiatric referral was made.  Another suspension for fighting was recorded by the Multipractice Clinic on March 11, 2009.  Continuing behavioral problems at school were testified to by plaintiff's mother at the administrative hearing that was held on March 31, 2009, a proceeding that had to be rescheduled on two prior occasions due to plaintiff's lack of cooperation.  On April 18, 2009, it was indicated that plaintiff had been involved in yet another fight at school and his failure to take responsibility for his actions was further documented on June 4, 2009.

As respects plaintiff's enuresis, the record reflects a history of that condition, possibly family-related, going back a number of years which was initially addressed by surgery in 2004. A history of bedwetting which had recently abated was related to Dr. Durdin on April 30, 2007. By September 27, 2007, however, evening episodes of incontinence had returned.  Urinary frequency was documented by NOPKMC personnel on October 23, 2007 and continuing enuresis was noted by the Multipractice Clinic on December 29, 2008.  By the time that the administrative hearing was held plaintiff was twelve years of age, making any ongoing enuresis even more troubling.  Although plaintiff and his mother gave conflicting testimony as to whether he had soiled himself at school

just the day before, the ALJ did not attempt to resolve that conflict, much less even acknowledge the testimony at all, nor did he address what effect that condition had on plaintiff's ability to care for himself.  Indeed, the ALJ's opinion does not even mention the evidence of enuresis set forth above. Evidence of this hygiene issue should not have been ignored.  See Goffney v. Astrue, 2011 WL 1297184 at *9 (S.D. Miss. March 31, 2011).

In Carter v. Astrue, 2009 WL 1203355 at *6-7 (W.D. La. May 1, 2009), the court was presented with evidence of inappropriate conduct at school that was very similar to the matter at hand. That evidence included several suspensions and an expulsion that "... obviously prevented [the plaintiff] from attending school on a regular basis." (Id.). In view of that evidence, the court in Carter ruled as follows:

> [t]he record shows that J.A.C. has not shown ability to recognize what is acceptable and unacceptable behavior or an ability to control his behavior or avoid behaviors that are bad for him.   Accordingly, the undersigned concludes that substantial evidence does not support the ALJ's determination that J.A.C. does not have at least a marked impairment in this domain.
>
> As discussed above, an impairment functionally equals a listed impairment if it results in marked limitations in two domains or an extreme limitation in one domain. The record clearly shows that J.A.C. has at least a marked impairment in at least two areas; interacting and relating with others and his

ability to care for himself. The ALJ's conclusion to the contrary is not supported by substantial evidence.

Carter, 2009 WL 1203355 at *7.

In light of that finding, the court in Carter ordered that the Commissioner's decision be reversed and that the child be awarded SSI benefits. Carter, 2009 WL 1203355 at *8. Because "[r]ating the limitations caused by a child's impairment(s) in each and every domain that is affected is not 'double-weighting' of either the impairment(s) or its effects", SSR 09-7p, 2009 WL 396029 at *4, the same result as in Carter should obtain here. It will be so recommended.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be granted, that defendant's motion for summary judgment be denied, and that plaintiff's case be remanded to the Commissioner for an award of benefits.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass

29

v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this _3rd__ day of ____November_____, 2011.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

30